UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF NEW YORK

GERALD RAKIECKI,          )
                          )
    Plaintiff,            )
                          )
    v.                    )          Case No. 1:23-cv-01329-GWC
                          )
DOUGLAS A. COLLINS, Secretary of   )
Veterans Affairs, in his Official Capacity,   )
                          )
    Defendant.            )

## ORDER ON MOTIONS TO DISMISS
### (Docs. 5, 18)

Gerald Rakiecki claims that, while employed as a police officer at the Buffalo, New York

VA Medical Center, he was subjected to "discriminatory terms and conditions of employment,

including harassment, a hostile work environment, discipline, and suspension of duty"

constituting sex and age discrimination as well as retaliation for protected activities under federal

and state law. (Doc. 17 ¶ 1.) Defendant moved to dismiss the original complaint under Fed. R.

Civ. P. 12(b)(6), arguing that Plaintiff cannot maintain his state-law claims against a federal

agency and that he has failed to state any plausible federal claim. (Doc. 5.) After briefing on

that motion was complete, Plaintiff moved to amend the complaint. (Doc. 11.) The court heard

argument on the motion to dismiss and on the motion to amend on November 6, 2025, and

subsequently issued an order granting leave to amend (except as to a proposed claim under the

Whistleblower Protection Act), and inviting supplemental briefing on the motion to dismiss.

(Doc. 16.)

Defendant filed a combined motion dismiss under Rules 12(b)(1) and 12(b)(6), and also a

motion for summary judgment under Fed. R. Civ. P. 56, on April 1, 2026. (Doc. 18.) Plaintiff

opposes those motions (Doc. 19), and Defendant has filed a reply (Doc. 20). All pending motions are therefore ripe for decision.

## Background

The court summarizes the allegations below, first with respect to the allegations regarding events between 2017 and 2020 (which appear in both the original and Amended Complaint), and then regarding the allegations concerning events in June 2021 and after (new allegations added in the Amended Complaint). Additional facts that relate to the summary-judgment aspect of Defendant's motion are set forth below.

### Events 2017 Through 2020 (Allegations Regarding Det. Stanbro and Chief Steinmetz)

Mr. Rakiecki identified as a male over age 40 at all relevant times. (Doc. 17 ¶ 6.) He began his employment with the United States Department of Veterans Affairs ("VA") in September 1990 at its Buffalo, New York VA Medical Center facility ("Buffalo VAMC" or the "facility" or "hospital"). (*Id.* ¶ 8.) He held the position of Police Officer from the date of his hire until December 2023, when he was promoted to the title of Senior Police Officer. (*Id.*) At all relevant times, his first-line supervisor was Lieutenant Kenneth Renne, and his second-line supervisor was Deputy Chief of Police William Scribner. (*Id.* ¶ 9.) His third-line supervisor was either (now former) Chief of Police Michael D. Steinmetz or former Chief of Police Jeremy Novak. (*Id.* ¶ 10.) At various times throughout his years of employment with the VA, Mr. Rakiecki participated in Equal Employment Opportunity (EEO) complaints as a union member or as personal representative to other employees. (*Id.* ¶ 11.)

In April 2017, Mr. Rakiecki complained to management that one of his coworkers, Detective Rachel Stanbro, engaged in professional misconduct and violations of VA policy. (*Id.* ¶ 12.) The alleged misconduct included an improper interaction with a veteran, violation of the

2

firearms policy, an affair with a co-worker, an act of sexual gratification on VA property, placing a surreptitious recording device at the VA premises, and handling a motor vehicle incident incorrectly. (*Id.* ¶¶ 13–26.) In connection with the motor vehicle incident, Ms. Stanbro indicated that she would accede to the request of a retired Buffalo police officer who came to the office seeking the identity of an individual who had damaged the officer's vehicle. (*Id.* ¶¶ 14, 17.) Ms. Stanbro referred to Mr. Rakiecki's opposition to releasing that information as "bullshit." (*Id.* ¶¶ 17, 20.) Mr. Rakiecki disagreed, referencing "HIPPA and privacy laws," and advising Ms. Stanbro that disclosing the information could result in discipline. (*Id.* ¶ 18.) Mr. Rakiecki stated that he believed Detective Stanbro's ability to perform law enforcement activities was compromised as a result of her alleged conduct. (*Id.* ¶ 12.)

Chief Steinmetz and Lieutenant Renne investigated some of the allegations against Detective Stanbro, ultimately finding them unsubstantiated. (*Id.* ¶ 27.) Chief Stienmetz informed Mr. Rakiecki that "appropriate actions" were taken against Detective Stanbro. (*Id.* ¶ 28.) Chief Steinmetz did not inform Mr. Rakiecki as to the details of the investigation, the outcome, or whether any discipline was issued to Detective Stanbro. (*Id.*)

In late 2017, Detective Stanbro was assigned to be the lead on a special project to revise the VA Police Department's Standard Operating Procedures (SOPs). (*Id.* ¶ 29.) Mr. Rakiecki was also assigned to that project. (*Id.*) On November 27, 2017, Detective Stanbro insinuated, in either words or substance, that Mr. Rakiecki was a "rat" for making the complaints against her. (*Id.* ¶ 30.) Another coworker later told Mr. Rakiecki that Detective Stanbro made a verbal threat against the person who made a complaint against her, stating that when she found out who made the complaint, that person would be "done." (*Id.* ¶ 32.) On January 10, 2018, Mr. Rakiecki requested that he be removed from the SOP project; that request was granted. (*Id.* ¶ 33.)

3

On February 5, 2018, Detective Stanbro filed a complaint with the EEO office against Mr. Rakiecki, alleging a hostile work environment. (*Id.* ¶ 34.) Mr. Rakiecki alleges on information and belief that Detective Stanbro's complaint against him "was based on false accusations, was unfounded, and was in retaliation for [his] previous complaints against her." (*Id.* ¶ 35.) On March 30, 2018, Mr. Rakiecki filed a complaint with the VA's Office of Accountability and Whistleblower Protection ("OAWP") concerning Detective Stanbro and the complaints about her conduct. (*Id.* ¶ 36.) OAWP substantiated Mr. Rakiecki's allegations that Detective Stanbro had violated the VA's uniform/weapons policy. (*Id.* ¶ 37.) In early May 2018, the EEO office concluded that Detective Stanbro's complaints against Mr. Rakiecki could not be substantiated. (*Id.* ¶ 38.)

Mr. Rakiecki contacted a VA EEO counselor on May 16, 2018. (*Id.* ¶ 5.) He alleged discrimination and a hostile work environment based on sex and age. (*Id.*) He also alleged reprisal for prior protected EEO activity. (*Id.*) Mr. Rakiecki filed a formal EEO complaint with the VA on June 9, 2018. (*Id.*)

On July 19, 2018, Detective Stanbro voluntarily resigned from the VA Police service to take a position with a New York State law enforcement agency. (*Id.* ¶ 39.) In March 2019, long after she was no longer a member of the VA Police, Ms. Stanbro visited the Buffalo VAMC. (*Id.* ¶ 40.) During her visit, she carried her state-issued service firearm. (*Id.*) Mr. Rakiecki alleges that Ms. Stanbro was not on official business during her visit to the Buffalo VAMC. Instead, he believes she was there to visit her former coworkers and also "to further intimidate, harass, and retaliate against [him] with her presence." (*Id.* ¶ 42.)

After Ms. Stanbro's visit, Mr. Rakiecki complained to his lieutenant that Ms. Stanbro violated VA policy prohibiting the possession of firearms, carried openly or concealed, except by

4

federal or state law enforcement officers on official business. (*Id.* ¶ 41.) Buffalo VAMC management chose not to discipline Ms. Stanbro. (*Id.* ¶ 42.)

On February 26, 2019, Chief Steinmetz held a meeting for the VA Police during what was designated as officer "training time." (*Id.* ¶ 43.) Shortly before the meeting began, Chief Steinmetz contacted several officers and asked them to attend the meeting. (*Id.*) Mr. Rakiecki was not contacted about the meeting before it started. (*Id.*) He learned about the meeting while looking for two other officers; a sergeant advised him that the officers were in a meeting with Chief Steinmetz. (*Id.*) Mr. Rakiecki then joined the meeting that was in progress. (*See id.* ¶ 46.) Mr. Rakiecki alleges on information and belief that Chief Steinmetz intentionally did not invite him to the meeting. (*Id.* ¶ 44.)

During the February 2019 meeting, Chief Steinmetz discussed proposed changes to each officer's schedule, including Mr. Rakiecki's. Each officer present stated their preferred shift on the new schedule. Chief Steinmetz also mentioned the possibility that Mr. Rakiecki's shift would be eliminated altogether. (*Id.* ¶ 45.) At the meeting, Mr. Rakiecki spoke about his prior EEO complaints and his prior complaints about Ms. Stanbro. Chief Steinmetz interrupted Mr. Rakiecki at one point, stating in words or substance, "I'm talking, and I'm the Chief." (*Id.* ¶ 46.) A sergeant who was present at the meeting stated to Chief Steinmetz that he did not see the need to eliminate Plaintiff's shift. (*Id.* ¶ 47.)

Chief Steinmetz published the new work schedule on March 26, 2019. When Mr. Rakiecki read the schedule, he noticed that he did not get the shift he stated that he wanted during the February meeting. Meanwhile, every other officer present at that meeting received the shift they stated was their preference at that time. In fact, with the schedule changes, only

one previous shift was eliminated entirely: Mr. Rakiecki's. Mr. Rakiecki was placed on a new, much less desirable shift following the changes. (*Id.* ¶ 48.)

Mr. Rakiecki filed a second formal EEO complaint on April 20, 2019, alleging a hostile work environment due to age and reprisal. (*Id.* ¶ 5.)

On September 17, 2019, Mr. Rakiecki learned that a coworker was given collateral time-keeping duties. (*Id.* ¶ 49.) For several years before then, Mr. Rakiecki had repeatedly made it known to each of his coworkers and Chief Steinmetz that he was interested in performing collateral time-keeping duties. (*Id.* ¶ 50.) The officer who was given the time-keeping duties had less seniority than Mr. Rakiecki. (*Id.* ¶ 51.) Management later claimed that it was VA policy that only sergeants could perform time-keeping duties. (*Id.* ¶ 52.) The officer who was given the time-keeping duties over Mr. Rakiecki was not a sergeant. (*Id.* ¶ 53.) On September 21, 2019, that officer advised Mr. Rakiecki that he (Mr. Rakiecki) would have been assigned the time-keeping duties if he had not made his complaints to management. (*Id.*)

In December 2019, Chief Steinmetz directed Mr. Rakiecki to report for a psychological fitness-for-duty evaluation based on an alleged comment that Mr. Rakiecki made to another officer at an earlier date. (*Id.* ¶ 54.)[1] The psychological fitness-for-duty evaluation was not a routine examination, but instead was an exam that the VA scheduled independently and specifically for Mr. Rakiecki. (*Id.* ¶ 55.) Pending the results of the evaluation, Mr. Rakiecki would be detailed to light duty, primarily performing dispatch functions. He was also required to

---

[1] The Amended Complaint includes a copy of an EEOC appellate decision affirming a ruling by the AJ that Mr. Rakiecki had failed to prove that the VA subjected him to discrimination or a hostile work environment. (Doc. 17-1 at 6.) The AJ's decision describes the alleged comment: Mr. Rakiecki allegedly stated that "he cares less and less about using the least amount of force necessary, he feels he is a sociopath, is quick to resort to using OC spray, and he was going to drive his thumbs into the eyes of someone in a fight." (Doc. 5-2 at 18, ¶ 89.)

6

surrender his service firearm pending the results of the evaluation. (*Id.* ¶ 56.) Mr. Rakiecki performed this light duty role for approximately five months continuously from December 2019 until April 2020. (*Id.* ¶ 58.)

For his fitness evaluation, Mr. Rakiecki was scheduled to meet with Dr. Jay Supnick of Law Enforcement Psychological Associates ("LEPA"), whom the VA contracted to perform many evaluations of police officers in the past, including routine evaluations. (*Id.* ¶ 59.) For the fitness evaluation, Mr. Rakiecki met with Dr. Supnick on three separate dates: January 8, 16, and 22, 2020. (*Id.* ¶ 61.) Dr. Supnick's office is in Rochester, New York, about a one-hour drive from where Mr. Rakiecki lives and where the Buffalo VAMC is located. (*Id.* ¶ 60.) Mr. Rakiecki had to drive this trip each way for each of his visits with Dr. Supnick. (*Id.*)

Dr. Supnick produced a written report of his evaluation. (*Id.* ¶ 63.) The report included a note that, during an interview of VA Assistant Director of Human Resources Andrew Ferree, Mr. Ferree "spontaneously said that the Chief would probably like to get rid of [Mr. Rakiecki] because he has caused so many problems for the Department." (*Id.* ¶¶ 62, 64.) The report also included a paragraph entitled "Concerns About This Evaluation" in which Dr. Supnick stated:

- "[T]here are discrepancies in the information provided by the VA about Officer Rakiecki";

- "[T]here are also discrepancies between this information and other co-lateral contacts"; and

- "Officer Rakiecki was referred for a fitness for duty evaluation without anyone in the VA Police Administration [] meeting with Officer Rakiecki to ask what he meant by his statements to Sergeant Jablonski or to get his account of the interaction."

7

(*Id.* ¶ 65 (final brackets in original).)  Mr. Rakiecki alleges that, before being instructed to report for the evaluation, no one at the VA spoke with him at all about why he was being sent for the evaluation.  (*Id.*)

Dr. Supnick also noted in his report: "I expressed these concerns to Chief Steinmetz and to Andrew Ferree, Assistant Director of Human Resources.  No satisfactory resolution to these problems [has] been forthcoming from them."  (*Id.* ¶ 66.)  Dr. Supnick concluded his report as follows:

> [Mr. Rakiecki's] level of psychological distress is being displayed in the form of increased suspiciousness and obsessiveness and is affecting his ability to effectively interact with some members of his department and hospital staff.  This condition renders him not fit for duty at this time.  I believe that his condition is temporary and that, with the proper treatment, he should be able to return to full duty within a reasonable amount of time.  In the meantime, Officer Rakiecki is psychologically fit for light duty.

(*Id.* ¶ 67.)  Mr. Rakiecki alleges on information and belief that Dr. Supnick has recommended light duty for police officers at the Buffalo VAMC "on numerous occasions in the past."  (*Id.* ¶ 68.)

After Dr. Supnick issued his report, the VA sent Mr. Rakiecki a notice dated April 24, 2020, and signed by Chief Steinmetz.  (*Id.* ¶¶ 69, 72.)  The notice stated that "the recommendation is that you remain on light duty for a period of at least three months and be reevaluated."  (*Id.* ¶ 69.)  The notice further stated: "After assessment, at this time, within the Police Department, there are no positions of light duty."  (*Id.* ¶ 70.)  The notice advised Mr. Rakiecki that, effective April 25, 2020, he would be placed in leave status, and that if he did not have any accrued leave to cover his absence, his leave days would be classified as Leave Without Pay ("LWOP").  (*Id.* ¶ 56.)

Mr. Rakiecki alleges on information and belief that Chief Steinmetz decided that there was no light duty position for Mr. Rakiecki at that time and made the decision to place him on

indefinite leave. (*Id.* ¶ 73.) He also alleges that, contrary to Chief Steinmetz's assertion, there were light duty positions to which he could have been assigned, including the dispatch position that he had continuously worked between December 2019 and April 2020, as well as monitoring cameras or preparing police reports. (*Id.* ¶¶ 79–81.) At the time Mr. Rakiecki was placed on enforced leave on April 25, 2020, the VA Police at the Buffalo VAMC were already short-staffed. (*Id.* ¶ 84.) Chief Steinmetz himself had to personally cover the shift of an officer who was unable to report for duty on at least one occasion, and other officers were required to work overtime to cover Mr. Rakiecki's shifts while he was out on leave during this period. (*Id.*)

After his leave period took effect, Mr. Rakiecki received another notice, this one dated April 29, 2020. (*Id.* ¶ 74.) The April 29 notice referred to his "Proposed Enforced Leave Suspension" from the week before and stated: "It is proposed to suspend you from duty for an indefinite period of time because you have been found unfit for duty. You will not be allowed to return to the VA until it is determined that you are fit for duty." (*Id.*) The April 29 notice further stated that "[t]he final decision to effect the action proposed has not been made" and that Mr. Rakiecki would be allowed seven days to submit a written reply to the "proposed" leave. (*Id.* ¶ 75.) The notice advised that "[i]f it is the decision of the Medical Center Director that you be suspended from duty indefinitely, your suspension from duty, while being charged annual leave, sick leave, or leave without pay, begins on the first date of the enforced leave." (*Id.* (brackets in original).)

Mr. Rakiecki asserts that it was a violation of VA policy and law for the VA to impose his leave or suspension before he had an opportunity to submit a written response to the proposed action against him. (*Id.* ¶ 76.) Contrary to that alleged policy, the VA placed Mr. Rakiecki on leave before it notified him of his right to respond to the proposed action. (*Id.*) Mr. Rakiecki

9

used multiple weeks' worth of his accrued paid leave to cover his enforced leave period so that he was not without income during that period. (*Id.* ¶ 77.)

On May 13, 2020, Mr. Rakiecki amended the EEO complaint that he filed in April 2019, adding allegations that VA personnel retaliated against him for his protected EEO activity. (*Id.* ¶ 5.) Analyzing all three EEO complaints (the June 2018 complaint, the April 2019 complaint, and the May 2020 amendments), an EEOC Administrative Judge (AJ) ruled on July 28, 2021, that Mr. Rakiecki had failed to prove that the VA subjected him to discrimination or a hostile work environment. (Doc. 17-1 at 5; *see also* Doc. 5-2.) Mr. Rakiecki appealed under 29 C.F.R. § 1614.403(a), and, in a decision dated September 28, 2023, the EEOC affirmed the final decision finding no discrimination. (Doc. 17-1 at 6.) The EEOC decision advised Mr. Rakiecki of his right to file a civil action within 90 days. (*Id.* at 7.) He filed his original Complaint in this court on December 27, 2023. (Doc. 1.)

**Events in June 2021 and After (Allegations Regarding Lt. Crawford)**

In June 2021, Mr. Rakiecki heard Lieutenant Jason Crawford call veteran and retired VA police sergeant James Borkowski a "piece of shit." (*Id.* ¶ 87.) Lt. Crawford also ordered Mr. Rakiecki not to allow Mr. Borkowski to visit the substation. (*Id.*) Mr. Borkowski received the following text message from Lt. Crawford, which Mr. Borkowski shared with Mr. Rakiecki:

> If you ever come to the VA don't look at me don't even think about talking to me. I will ignore you as though you are not there. The fact that you came into the VA after you retired and started talking shit about me and that I shouldn't have gotten the [Lieutenant Position] and how Widdekind should have gotten it just proves to me how bitter you are and how truly threatened you are by me. It shows to me that you aren't a man at all. I would have more respect for you if you would've walked to me and said that instead of smiling and congratulating me. Worthless.

(*Id.* (brackets in original).) Later in June 2021, Mr. Rakiecki reported Lt. Crawford's actions to VA Patient Advocate Carol Griffith and to Deputy Chief Richard King. (*Id.* ¶ 88.)

10

Between June and September 2021, Lt. Crawford made several derogatory and prejudiced remarks against Mr. Borkowski's wife, officer Tracy Cain, who had recently transferred from the Batavia VA. (*Id.* ¶ 89.) These comments led Ms. Cain to quit. (*Id.* ¶ 91.) Mr. Rakiecki discussed those events with VA Investigator Matthew Altonji, and also informed Deputy Chief King. (*Id.* ¶ 92.)

In September 2021, after Mr. Rakiecki served as a witness on behalf of Ms. Cain, Lt. Crawford began to "target" Mr. Rakiecki, harassing him and sending him "threatening text messages." (*Id.* ¶ 93.) Mr. Rakiecki brought this conduct to Deputy Chief King's attention. (*Id.*) He also began to document incidents that he had with Lt. Crawford. (*Id.* ¶ 94.) Those incidents included:

- A period of time between September 2021 and January 2022 when Mr. Rakiecki witnessed Lt. Crawford taunt and humiliate a veteran, and also deny him water and a fresh sanitary mask; then "screamed" at Mr. Rakiecki and threatened to discipline him after he (Rakiecki) gave water to the veteran;

- Also during that time, Lt. Crawford required Mr. Rakiecki to criminally charge a veteran's son for a small amount of marijuana;

- Lt. Crawford "inappropriately distribute[d] overtime" in December 2021; Mr. Rakiecki filed a grievance on that issue and prevailed;

(*Id.* ¶¶ 95–100.)

Dr. Supnick questioned Mr. Rakiecki about his feelings regarding Lt. Crawford in February 2022; Mr. Rakiecki responded that he did not wish to discussed Lt. Crawford. (*Id.* ¶ 101.) On February 25, 2022, Chief Scribner and Deputy Chief King summoned Mr. Rakiecki to their office and informed him that he was to speak with Dr. Supnick again. (*Id.* ¶ 102.) Dr.

11

Supnick informed Mr. Rakiecki that Chief Scribner had reported him for filing too many complaints, and that Chief Scribner believed the complaints were due to Mr. Rakiecki's anxiety and that he should be "monitored." (*Id.*) Mr. Rakiecki stated that he believed this was just an attempt to use anxiety as a way to "silence" him. (*Id.* ¶ 103.)

Mr. Rakiecki alleges the following additional incidents:

- Between March and October 2022, Lt. Crawford "manipulated Plaintiff's work schedule, split his days off, and used his 2022 midterm evaluation as a counseling device";

- Also during that time, Lt. Crawford "denied Plaintiff union representation[,] . . . attempted to force him to solicit shifts, tried to make him switch to twelve-hour tours, and tried to make Plaintiff work more night shifts";

- After a meeting in October 2022 at which Mr. Rakiecki expressed his belief that he was being targeted and punished, management removed his alternate weekend shifts;

- In the 2022 performance evaluation that Lt. Crawford wrote, he asserted that Mr. Rakiecki made a statement that Mr. Rakiecki did not make;

- Lt. Crawford lowered Mr. Rakiecki's performance level from "excellent" to "fully successful";

- Even after a January 2023 union meeting resulted in Lt. Crawford's removal as Mr. Rakiecki's supervisor, Lt. Crawford continued to "harass[]" Mr. Rakiecki, including by "scurtiniz[ing] Plaintiff's written reports in a manner that he did not do for others" and by "attempt[ing] to negatively change Plaintiff's schedule even after he was no longer responsible for scheduling."

(*Id.* ¶¶ 104–112.)

12

Finally, Mr. Rakiecki asserts that the above alleged retaliation "was motivated, at least in part, by Plaintiff's status as a witness in connection with complaints by Sean Saramak, a veteran and now former employee of Defendant, alleging discrimination and retaliation by Defendant, including Plaintiff's having accompanied Mr. Saramak as a witness when Mr. Saramak reported the conduct to the Federal Bureau of Investigation." (*Id.* ¶ 113.)

### Applicable Standards

**Rule 12(b)(1).** "Determining the existence of subject matter jurisdiction is a threshold inquiry and a claim is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Morrison v. Nat'l Australia Bank*, 547 F.3d 167, 170 (2d Cir. 2008.) "The plaintiff bears the burden of proving subject matter jurisdiction by a preponderance of the evidence." *Liranzo v. United States*, 690 F.3d 78, 84 (2d Cir. 2012). "In resolving a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) a district court may consider evidence outside of the pleadings." *Morrison*, 547 F.3d at 170.

**Rule 12(b)(6).** To survive a Rule 12(b)(6) motion to dismiss for failure to state a claim, Plaintiff's complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Eastman Kodak Co. v. Henry Bath LLC*, 936 F.3d 86, 93 (2d Cir. 2019) (internal quotation marks omitted) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). In evaluating Defendant's Rule 12(b)(6) motion, the court must "draw[] all reasonable inferences in favor of the plaintiff." *Biocad JSC v. F. Hoffmann-La Roche*, 942 F.3d 88, 93 (2d Cir. 2019). "Dismissal is appropriate when 'it is clear from the face of the complaint . . . that the plaintiff's claims are barred as a matter of law.'" *Id.* (alteration in original) (quoting *Parkcentral Glob. Hub Ltd. v. Porsche Auto Holdings SE*, 763 F.3d 198, 208–09 (2d Cir. 2014)).

13

## Analysis

The court evaluates Defendant's May 2024 and April 2026 motions (Docs. 5, 18) together, considering the arguments in both motions organized with respect to each of the remaining claims in the Amended Complaint.[2]

### I.    NYSHRL Claims (Counts 3, 4, and 7)

Defendant asserts that the claims in Counts 3, 4, and 7 for sex discrimination, age discrimination, and retaliation under the New York State Human Rights Law (NYSHRL), N.Y. Exec. L. § 296, must be dismissed because federal agencies cannot be held liable under state anti-discrimination statutes such as the NYSHRL. (Doc. 5-4 at 7; Doc. 18-6 at 13.) Mr. Rakiecki concedes this point and stipulates to dismissal of the NYSHRL claims. (Doc. 8 at 1 n.1; Doc. 19 at 16 n.1.)

### II.    Title VII Sex Discrimination Claim (Count 1)

In Count 1, Mr. Rakiecki asserts that Defendant discriminated against him on the basis of sex in violation of Title VII[3] by subjecting him to disparate treatment, including:

---

[2] As noted above, the court denied leave to amend as to a proposed claim (proposed Count 8) under the Whistleblower Protection Act.

[3] Section 2000e-2(a)(1) of Title 42 states: "It shall be an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." Although the term "employer" excludes the United States, *id.* § 2000e(b), Section 2000e-16(a) extends protection to federal employees, including VA personnel like Mr. Rakiecki. *See* 42 U.S.C. § 2000e-16(a) ("All personnel actions affecting employees or applicants for employment . . . in executive agencies as defined in section 105 of Title 5 . . . shall be made free from any discrimination based on race, color, religion, sex, or national origin."). Courts apply the same legal standards for claims under § 2000e-16(a) as for claims against private employers under § 2000e-2(a). *See, e.g., Morton v. Mancari*, 417 U.S. 535, 547 (1974) ("In general, it may be said that the substantive anti-discrimination law embraced in Title VII was carried over and applied to the Federal Government."); *Komis v. Sec'y of U.S. Dep't of Lab.*, 918 F.3d 289, 294 (3d Cir. 2019) ("Although the language of § 2000e-16(a) differs from the language of the private-sector antidiscrimination and antiretaliation provisions, many courts have

14

[D]iscriminatory terms and conditions of employment, harassment, and a hostile work environment, particularly with respect to Defendant's pattern of preferential treatment of Detective Stanbro in failing to take any corrective action against her for Plaintiff's complaints against her, whereas Defendant repeatedly and unfairly neglected, marginalized, criticized, disrespected, and ultimately disciplined Plaintiff on numerous occasions between 2017 and 2020.

(Doc. 17 ¶ 116.) The Supreme Court has distinguished between "discrete acts" and "hostile environment" claims for purposes of Title VII. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002). Count 1 includes claims of both types. The court reviews the plausibility of each in turn.

## A.     Discrete Acts

As to the "discrete acts" aspect of Count 1, Defendant argues that the claim is not plausible because the Amended Complaint lacks allegations that Mr. Rakiecki and Ms. Stanbro "engaged in conduct of comparable seriousness" and because they held different positions at the relevant times. (Doc. 5-4 at 11 & n.3; Doc. 18-6 at 20 & n.2.) Mr. Rakiecki concedes that he and Ms. Stanbro held different titles, but he asserts that they both reported to the same decisionmaker and were both subject to the same standards of conduct and discipline. (Doc. 8 at 4.) As to the seriousness of their respective conduct, Mr. Rakiecki asserts that "at a minimum, this is a question of fact." (*Id.*; *see also* Doc. 19 at 21.)

The parties do not dispute the applicable substantive law. Claims of sex-based discrimination under Title VII are subject to the burden-shifting framework in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See King v. Aramark Servs. Inc.*, 96 F.4th 546,

consistently interpreted § 2000e-16(a) 'to give federal employees the same rights as private employees.'" (quoting *Porter v. Adams*, 639 F.2d 273, 277–78 (5th Cir. 1981)), *abrogated on other grounds by Muldrow v. City of St. Louis*, 601 U.S. 346 (2024); *Taylor v. Solis*, 571 F.3d 1313, 1318 (D.C. Cir. 2009) (applying case law interpreting § 2000e-2(a) to claim brought under § 2000e-16(a)); *Brown v. Perry*, 184 F.3d 388, 393 (4th Cir. 1999) (same).

562 (2d Cir. 2024) (applying *McDonnell Douglas* to motion for summary judgment on sex-based

Title VII claim); *Walsh v. N.Y.C. Hous. Auth.*, 828 F.3d 70, 74–75 (2d Cir. 2016) ("Claims

of sex-based discrimination under Title VII . . . are analyzed using the familiar burden-shifting

framework established in *McDonnell Douglas* . . . ."); *see also Littlejohn v. City of New York*,

795 F.3d 297, 307 (2d Cir. 2015) (*McDonnell Douglas* "established the nature of a prima facie

case of discrimination under Title VII").

The *McDonnell Douglas* burden-shifting framework establishes the elements of a

Title VII plaintiff's prima facie case of discrimination: "(1) [he] is a member of a protected class;

(2) [he] is qualified for [his] position; (3) [he] suffered an adverse employment action; and

(4) the circumstances give rise to an inference of discrimination." *Vega v. Hempstead Union*

*Free Sch. Dist.*, 801 F.3d 72, 83 (2d Cir. 2015) (quoting *Weinstock v. Columbia Univ.*, 224 F.3d

33, 42 (2d Cir. 2000)). Then, if the plaintiff makes that showing, "[t]he burden then shifts to the

employer to 'articulate some legitimate, nondiscriminatory reason' for the disparate treatment."

*Id.* (citing *McDonnell Douglas*, 411 U.S. at 802). If the employer carries that burden, then the

plaintiff can show either "that the employer's stated justification for its adverse action was

nothing but a pretext for discrimination" *or* "that, even if the employer had mixed motives, the

plaintiff's membership in a protected class was at least one motivating factor in the employer's

adverse action." *Bart v. Golub Corp.*, 96 F.4th 566, 578 (2d Cir. 2024).

In the context of a Rule 12(b)(6) motion to dismiss a Title VII claim, however, "a

plaintiff is not required to plead a *prima facie* case under *McDonnell Douglas*, at least as the test

was originally formulated." *Id.* at 84 (discussing *Littlejohn v. City of New York*, 795 F.3d 297

(2d Cir. 2015)). "Rather, because a temporary presumption of discriminatory motivation is

created under the first prong of the *McDonnell Douglas* analysis, a plaintiff need only give

16

plausible support to a minimal inference of discriminatory motivation." *Id.* (internal quotation marks omitted). In other words, the "prima facie requirements" of the claim are "reduced" at the Rule 12(b)(6) stage. *Id.* (quoting *Littlejohn*, 795 F.3d at 312); *see also Neary v. Gruenberg*, 730 F. App'x 7, 12 (2d Cir. 2018) (summary order) ("*Littlejohn* standard" is "less demanding").[4] The parties agree that a Title VII plaintiff's burden at the Rule 12(b)(6) stage is "lighter" than the burden on a motion for summary judgment. (Doc. 5-4 at 8; Doc. 8 at 2.)

The court begins with the four elements constituting the first "prong" of the *McDonnell Douglas* analysis. Defendant does not challenge the first two elements: membership in a protected class[5] and qualification for the police officer position. As to the third element, Defendant argues that Mr. Rakiecki's assertions that he was "unfairly neglected, marginalized, criticized, [and] disrespected" do not constitute "adverse employment action." (Doc. 5-4 at 10 n.2.) Mr. Rakiecki relies on those allegations as part of the hostile-work-environment aspect of his claim, discussed below. For purposes of the "discrete acts" aspect of the claim, however, Mr. Rakiecki relies on the additional allegation that he was disciplined. Defendant does not dispute that discipline constitutes adverse employment action. *See, e.g., Chukwueze v. NYCERS*, 891 F. Supp. 2d 443, 453 (S.D.N.Y. 2012) (adverse employment action is typically shown by

---

[4] As other courts have noted, the cases use the phrase "prima facie" somewhat inconsistently. *See Kittle v. Mavis Discount Tire, Inc.*, No. 24-cv-2537, 2025 WL 2721620, at *5 n.4 (E.D.N.Y. Sept. 24, 2025).

[5] "[M]en are not traditionally the protected class under Title VII." *McLean v. WE Transp.*, No. 22-cv-00437, 2023 WL 5177912, at *3 n.2 (D. Conn. Aug. 10, 2023). But "[i]n the Title VII context, the Supreme Court has also steadfastly held male plaintiffs to the same standard as female plaintiffs—no more or less." *Tappe v. All. Cap. Mgmt. L.P.*, 177 F. Supp. 2d 176, 182 (S.D.N.Y. 2001); *see also Windhauser v. Bausch & Lomb, Inc.*, 302 F. Supp. 2d 139, 143 n.1 (W.D.N.Y. 2003) (holding that male plaintiff was "not required to make any special showing of background circumstances in order to state a *prima facie* case of gender discrimination").

17

"discipline, demotion, transfer or termination" (quoting *O'Neill v. City of Bridgeport Police Dep't*, 719 F. Supp. 2d 219, 225 (D. Conn. 2010))).

Defendant's principal argument for dismissal of this claim focuses on the fourth element: whether the Amended Complaint contains plausible allegations to support a minimal inference of discriminatory motivation. "A plaintiff may raise such an inference by showing that the employer subjected him to disparate treatment, that is, treated him less favorably than a similarly situated employee outside his protected group." *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000).[6] "Whether two employees are similarly situated ordinarily presents a question of fact for the jury." *Id.* That determination depends on: "(1) whether the plaintiff and those he maintains were similarly situated were subject to the same workplace standards and (2) whether the conduct for which the employer imposed discipline was of comparable seriousness."[7] *Id.* at 40.

Defendant acknowledges that this inquiry is generally fact-intensive but asserts that dismissal is appropriate in this case because the Amended Complaint lacks allegations that "[Mr.

---

[6] Identifying a comparator who was treated differently is not the only way to raise the requisite inference of discriminatory motivation. *See McGuinness v. Lincoln Hall*, 263 F.3d 49, 54 n.2 (2d Cir. 2001) (no requirement "that a plaintiff always be able to show disparate treatment of an otherwise similarly situated employee as a necessary prerequisite to a prima facie case under Title VII" (citing *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 467 (2d Cir. 2001))); *George v. Roswell Park Cancer Inst. Corp.*, No. 22-cv-1006, 2025 WL 2208427, at *11 & n.7 (W.D.N.Y. Aug. 4, 2025) (identifying a comparator "is not the only method to raise an inference of discrimination"). In this case, Mr. Rakiecki relies exclusively on his assertion that Ms. Stanbro is a suitable comparator; he does not assert any other method to raise the necessary inference.

[7] Mr. Rakiecki has provided some analysis for his position that, despite their different titles, he and Ms. Stanbro "reported to the same decisionmaker and they were subject to the same standards of conduct and discipline." (Doc. 8 at 4.) Defendant's argument for dismissal does not address the similarity of workplace standards. The court therefore focuses on Defendant's arguments regarding the relative "seriousness" of Mr. Rakiecki and Ms. Stanbro's conduct.

18

Rakiecki] and his comparator, Stanbro, engaged in conduct of comparable seriousness."
(Doc. 5-4 at 11; *see also* Doc. 18-6 at 21.) Defendant relies on *Dooley v. JetBlue Airways Corp.*, 636 F. App'x 16 (2d Cir. 2015) (summary order), as an example of an appropriate dismissal under Rule 12(b)(6) when the female plaintiff (who was fired) and the two male comparators (who were not fired or even disciplined) did not plausibly engage in conduct of comparable seriousness.

Mr. Rakiecki does not seek to distinguish or even cite *Dooley* in his opposition. In *Dooley*, the plaintiff had unexcused missed work, whereas her comparators' absences were caused by job-related injuries. *Id.* at 21. In contrast, Mr. Rakiecki asserts that the comparator, Ms. Stanbro, engaged in misconduct by violating the uniform and firearms policy "when she possessed a firearm on the property when she was not authorized to do so." (Doc. 8 at 4.) He also points to Ms. Stanbro's other alleged conduct in 2017. (Doc. 19 at 20.)

This is not a case where the allegations fail to indicate that the comparator engaged in any misconduct at all. Nevertheless, *Dooley* does stand for the general proposition that, in some cases, a court may properly determine at the Rule 12(b)(6) stage whether the conduct of the plaintiff and the comparator were of "comparable seriousness." *See, e.g., Moultrie v. NYS Dep't of Corr. & Cmty. Supervision*, No. 13-cv-5138, 2015 WL 2151827, at *3 (S.D.N.Y. May 7, 2015) (granting motion to dismiss Title VII gender discrimination claim where plaintiff did not allege "that any of the proposed comparators engaged in misconduct of comparable seriousness").

Ms. Stanbro's alleged conduct includes events in 2017 as well as the occasion in March 2019, after she separated from employment with the VA, when she visited the Buffalo VAMC while carrying her state-issued service firearm. The alleged March 2019 conduct does

19

not support Mr. Rakiecki's comparator theory. The VA could not have carried out any adverse *employment* action against Ms. Stanbro for that conduct because she was no longer a VA employee.

Ms. Stanbro's alleged conduct in 2017 includes an improper interaction with a veteran, violations of the firearms policy, an affair with a co-worker, an act of sexual gratification on VA property, placing a surreptitious recording device at the VA premises, and improperly handling the request from the retired police officer for the identity of the individual who damaged his car. (Doc. 17 ¶¶ 13–26.) According to the Amended Complaint, Chief Steinmetz and Lieutenant Renne investigated but were unable to substantiate some of that conduct; and Chief Steinmetz advised Mr. Rakiecki that "appropriate actions" were taken against Ms. Stanbro. (*Id.* ¶¶ 27–28.) Because Mr. Rakiecki is entitled to all reasonable inferences at this stage of the case, the court infers that VA management imposed no appropriate discipline or any other adverse employment action against Ms. Stanbro for any of her 2017 alleged conduct.

Mr. Rakiecki's conduct was his alleged statement in December 2019 that "he cares less and less about using the least amount of force necessary, he feels he is a sociopath, is quick to resort to using OC spray, and he was going to drive his thumbs into the eyes of someone in a fight." (Doc. 5-2 at 18, ¶ 89.) In response to that alleged statement, Chief Steinmetz directed Mr. Rakiecki to report for a psychological fitness-for-duty evaluation.[8] As described above, that resulted in assignment to light duty pending the results of the evaluation, a determination that

---

[8] Courts have reached varying conclusions as to whether mandatory referral for mental health evaluation constitutes an adverse employment action for purposes of antidiscrimination laws. *See Buric v. Kelly*, 157 F. App'x 391, 394 (2d Cir. 2005) (summary order) ("[T]his Court has not held that referral for psychological examination, without more, is an adverse employment action . . . ."); *see also* Claudia G. Catalano, *Psychological Testing of Employee or Job Applicant as Violation of Title VII of Civil Rights Act of 1964*, 21 A.L.R. Fed. 3d Art. 1 (2017) ("[C]ourts have reached contrary conclusions on this issue.").

Mr. Rakiecki was not psychologically fit for more than light duty, and management's decision to place Mr. Rakiecki on involuntary leave status after finding no available light-duty positions.[9]

As stated in *Moultrie*, "[l]ess severe punishment for objectively less serious or qualitatively different misconduct does not raise an inference of discrimination." 2015 WL 2151827, at *3.  Here, the Amended Complaint includes allegations that the conduct of both individuals was serious insofar as the conduct implicated each individual's fitness for duty as a law enforcement officer.  (*See* Doc. 17 ¶ 12 (Mr. Rakiecki believed Ms. Stanbro's conduct indicated her ability to perform law enforcement activities was "compromised"); *id.* ¶ 54 (Mr. Rakiecki was referred for a psychological fitness-for-duty evaluation).)  With reasonable inferences drawn in Mr. Rakiecki's favor, the allegations also suggest that the VA imposed little or no discipline against Ms. Stanbro, whereas Mr. Rakiecki faced significant consequences, including referral for a psychological fitness-for-duty evaluation that eventually led to involuntary leave.

The court concludes, however, that Mr. Rakiecki and Ms. Stanbro's respective alleged conduct was qualitatively and significantly different.  All of Ms. Stanbro's alleged conduct appears to implicate professionalism, but the court cannot infer that any of the conduct suggested that Ms. Stanbro might pose an unreasonable threat of physical harm to anyone.  Focusing on the incident with the retired police officer whose car was damaged, Mr. Rakiecki asserts that "Stanbro expressed an intent to disclose the identity of an individual involved in a minor collision to a visibly upset retired officer actively seeking that person," thereby creating "a

---

[9] Placement on involuntary leave has been held to be sufficient "adverse employment action" at the motion-to-dismiss stage. *See Wilson v. Yonkers Pub. Schools*, No. 24-CV-00184, 2025 WL 2689081, at *7 (S.D.N.Y. Sept. 19, 2025) (concluding that "involuntarily being placed on sick leave . . . suffice[d] to show adverse employment action" at Rule 12(b)(6) stage of Title VII case; collecting cases).

tangible and immediate risk to that individual's safety." (Doc. 19 at 20.) Although the Amended Complaint describes the retired officer as being "not satisfied" (Doc. 17 ¶ 15); "complaining" (*id.* ¶ 16); and "insist[ing] that the suspect should be charged" (*id.*), the allegations do not support a conclusion that Ms. Stanbro's inclination to reveal the identifying information was likely to result in physical harm.

In contrast, Mr. Rakiecki allegedly remarked to another officer that "he cares less and less about using the least amount of force necessary, he feels he is a sociopath, is quick to resort to using OC spray, and he was going to drive his thumbs into the eyes of someone in a fight." (Doc. 5-2 at 18, ¶ 89.) Mr. Rakiecki seeks to discount this as "only a verbal statement" (Doc. 8 at 5) and as "lack[ing] any discernable or specific target" (Doc. 19 at 20). Of course, Mr. Rakiecki's alleged statements about what he might do in a physical altercation do not prove that he was certain to do any of those things. *Cf. State v. Sawyer*, 2018 VT 43, ¶ 1, 207 Vt. 636, 187 A.3d 377 (mem.) (reversing hold-without-bail order against defendant who wrote statements about "shooting up" his high school because the statements did not establish that the "evidence of guilt is great" as to crimes including attempted aggravated murder). But upon becoming aware of Mr. Rakiecki's alleged statements, his employer needed to take some action. *Cf. Bodenstab v. County of Cook*, 539 F. Supp. 2d 1009, 1020 (N.D. Ill. 2008) (after employee made threats against staff members, employer did not violate employee's rights by requiring him to sign an authorization for a psychiatric evaluation; employer "would have been grossly negligent to ignore such threats").

Notwithstanding Mr. Rakiecki's allegation that Dr. Supnick had previously recommended light duty for police officers at the Buffalo VAMC "on numerous occasions," (Doc. 17 ¶ 58), neither the allegations nor any reasonable inferences indicate that the VA

22

controlled Dr. Supnick's findings or his recommendation that Mr. Rakiecki be restricted to light duty. To the extent that Mr. Rakiecki alleges that there was no basis for Chief Steinmetz's determination that no "light duty" positions were available, and that the VA improperly placed Mr. Rakiecki on leave before it notified him of his right to respond to the proposed action, that alleged conduct does not alter the conclusion that Mr. Rakiecki and Ms. Stanbro were not "similarly situated."

Like *Dooley* and *Moultrie*, this case is therefore an exception from the rule stated in *Graham* that determining whether two employees are "similarly situated" is ordinarily a jury question. 230 F.3d at 39. The court concludes that the Amended Complaint does not plausibly allege that Mr. Rakiecki and Ms. Stanbro were similarly situated. To the extent that the Amended Complaint alleges that Mr. Rakiecki (a male officer) was subjected to greater discipline than Ms. Stanbro (a female detective), there is no plausible basis to conclude that the allegedly different treatment was on the basis of sex. Absent any other allegations that might support a sex-based discrimination claim, the court concludes that Defendant is entitled to dismissal of the discrete-acts aspect of the Title VII claim in Count 1.

## B.    Sex-Based Hostile Work Environment

Defendant assails the hostile-work-environment aspect of Count 1 as "almost . . . an aside," arguing that the allegations do not support the objective test for such claims or the causation requirement. (Doc. 5-4 at 15–18.) Mr. Rakiecki insists that the Amended Complaint meets the requisite standards. (Doc. 8 at 7; Doc. 19 at 22.) Defendant disagrees, arguing that Mr. Rakiecki's allegations do not satisfy the "severe or pervasive" component, and that the causation element is absent. (Doc. 9 at 4–7; Doc. 20 at 9.)

23

### 1.    Objective "Severe or Pervasive" Conditions

"In order to establish a hostile work environment claim under Title VII, a plaintiff must . . . show that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Shultz v. Congregation Shearith Israel of City of N.Y.*, 867 F.3d 298, 309 (2d Cir. 2017) (alteration in original; quoting *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 20 (2d Cir. 2014)). In addition to that objective component, "the victim must subjectively perceive the work environment to be abusive." *Chislett v. N.Y.C. Dep't of Educ.*, 157 F.4th 172, 187 (2d Cir. 2025) (quoting *Raspardo v. Carlone*, 770 F.3d 97, 114 (2d Cir. 2014)). Defendant does not seek dismissal for failure to establish the subjective component. The court therefore focuses on the objective "severe or pervasive" component of the test.

"In determining whether an actionable hostile work environment claim exists, courts look to all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Klymn v. Monroe Cnty. Sup. Ct.*, 641 F. Supp. 3d 6, 20 (W.D.N.Y. 2022) (internal quotation marks omitted). "Ultimately, to avoid dismissal under FRCP 12(b)(6), a plaintiff need only plead facts sufficient to support the conclusion that she was faced with harassment of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse . . . ." *Felton v. Monroe Cmty. Coll.*, 528 F. Supp. 3d 122, 140 (W.D.N.Y. 2021) (cleaned up). "[T]he Second Circuit has repeatedly cautioned against setting the bar too high in this context." *Id.* (cleaned up).

24

Mindful of that caution, the court nevertheless concludes that, for the reasons below, as in *Felton*, the plaintiff has failed to adequately allege a sex-based hostile work environment claim. Defendant asserts that the alleged conduct—"such as Stanbro filing a complaint against [Mr. Rakiecki], Stanbro calling him a 'rat,' [and] Chief Steinmetz interrupting him in a meeting"— does not meet the objective test. (Doc. 5-4 at 16.) Mr. Rakiecki argues that Defendant has "ignore[d] the balance of the conduct alleged in the Complaint," including:

> Plaintiff being unfairly neglected, marginalized, criticized and disrespected, including being subjected to threats, being falsely accused of engaging in a hostile work environment, being intentionally excluded from a meeting with his colleagues relating to shift scheduling, having the schedule modified to impact only Plaintiff's shift and being denied the opportunity to engage in the timekeeping duty.

(Doc. 8 at 7.) Defendant replies that all of those alleged incidents are "typical workplace disagreements" that are insufficient to satisfy the "severe or pervasive" component. (Doc. 9 at 4.)

Defendant's motion does not "ignore" any of the relevant conduct that must be considered in the court's holistic review of the circumstances. Defendant identified three alleged events as *examples* of the total alleged conduct. (*See* Doc. 5-4 at 16 (listing examples "such as" Chief Steinmetz interrupting Mr. Rakiecki at a meeting).) Even drawing all reasonable inferences in Mr. Rakiecki's favor, most of this alleged conduct fails to go beyond "'the ordinary tribulations of the workplace'" or "those petty slights or minor annoyances that often take place at work." *Burlington N. & Santa Fe. Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)). Of course, threatening conduct can weigh in favor of finding severity. Here, the Amended Complaint alleges one instance where Ms. Stanbro remarked to another coworker that, when she found out who made the complaint against her, that person would be "done." (Doc. 1 ¶ 32.) That single vague utterance—not made directly to Mr. Rakiecki—is unlikely to be sufficient. *Cf. Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 754

25

(1998) ("[W]e express no opinion as to whether a single unfulfilled threat is sufficient to constitute discrimination in the terms or conditions of employment.").

## 2.    Causation

Even if the totality of the alleged conduct could qualify as "severe" or "pervasive," the court agrees with Defendant that the Amended Complaint does not plausibly support a conclusion that any of the conduct was *because of* Mr. Rakiecki's sex. "[I]t is 'axiomatic' that in order to establish a sex-based hostile work environment under Title VII, a plaintiff must demonstrate that the conduct occurred because of [his] sex." *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002) (quoting *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001)). Title VII requires the party complaining of a hostile work environment to demonstrate "that . . . sex . . . was a motivating factor for any employment practice, even though other factors also motivated the practice." *Bauers-Toy v. Clarence Cent. Sch. Dist.*, No. 10-CV-845, 2015 WL 13574291, at *4 (W.D.N.Y. Sept. 30, 2015) (quoting 42 U.S.C. § 2000e-2(m)). Absent this causal connection, "[t]he mere allegation of hostility is not enough." *Vandermark v. City of New York*, 615 F. Supp. 2d 196, 209 (S.D.N.Y. 2009).

All of the alleged conduct against Mr. Rakiecki is sex-neutral on its face; none of the events specifically involve sex, carry any sexual overtones, or otherwise appear to be predicated on sex. Of course, "actions that are neutral on their face can be considered in assessing the totality of the circumstances for a hostile work environment claim." *Boza-Meade v. Rochester Hous. Auth.*, 170 F. Supp. 3d 535, 547–48 (W.D.N.Y. 2016). Still, "there must be some circumstantial or other basis for inferring that such incidents were in fact discriminatory." *Id.* at 548 (cleaned up). The only basis that Mr. Rakiecki offers for that inference is his contention that Ms. Stanbro and Chief Steinmetz "did not subject persons who were not a part of Plaintiff's

26

protected age and gender classes to the same degree of harassment." (Doc. 8 at 7; *see also* Doc. 19 at 23 (asserting a "pattern of preferential treatment" in favor of Mr. Rakiecki's female coworker, Ms. Stanbro).) But, absent any specifics about the VA treating similarly situated women better, this argument is just a repackaged version of Mr. Rakiecki's contentions about Ms. Stanbro as a comparator. The court rejects that argument for the reasons discussed above.

## III.   ADEA Age Discrimination Claim (Count 2)

In Count 2, Mr. Rakiecki asserts that "Defendant engaged in discrimination against Plaintiff on the basis of his age in violation of the ADEA by subjecting Plaintiff to disparate treatment as set forth above, which included discriminatory terms and conditions of employment, harassment, and a hostile work environment." (Doc. 17 ¶ 120.) Under the ADEA, it is unlawful for an "employer" to "discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). The statute's definition of "employer" does not include the United States. *Id.* § 630(b). As in the Title VII context, a separate provision prohibits age-based discrimination for federal employees. *See id.* § 633a(a) ("All personnel actions affecting employees . . . who are at least 40 years of age . . . in executive agencies as defined in section 105 of Title 5 . . . shall be made free from any discrimination based on age."). Similar to the protection for public-sector workers in 42 U.S.C. § 2000e-16(a), and absent any argument to the contrary, the court interprets § 633a(a) to give federal employees the same rights that private employees enjoy under § 623(a)(1).[10]

---

[10] *See Simpson v. United States*, 467 F. Supp. 1122, 1126 (S.D.N.Y. 1979) (noting that 42 U.S.C. § 2000e-16 "is analogous to 29 U.S.C. § 633a(a)").

27

As in the Title VII context, "the distinction between discrete acts and a hostile work environment also applies to ADEA." *Roginsky v. M&T Bank*, No. 19-cv-1613, 2022 WL 2671707, at *8 (W.D.N.Y. June 21, 2022) (cleaned up; quoting *Subramanian v. Prudential Sec., Inc.*, No. CV016500, 2003 WL 23340865, at *4 (E.D.N.Y. Nov. 20, 2003)), *report and recommendation adopted*, 2022 WL 2669920 (W.D.N.Y. July 11, 2022). Count 2 includes claims of both types. The court reviews the plausibility of each in turn.

## A.    Age-Based Discrete Acts

Courts in the Second Circuit analyze ADEA claims under the *McDonnell Douglas* burden-shifting framework. *Lively v. WAFRA Inv. Advisory Grp., Inc.*, 6 F.4th 293, 302 n.3 (2d Cir. 2021). The discrete-acts aspect of Count 2 appears to involve the same alleged facts and legal arguments as the discrete-acts aspect of Count 1. For the same reasons that the Amended Complaint does not satisfy even the "reduced" requirements of the first prong of the *McDonnell Douglas* for the sex-based claim in Count 1, *see supra*, it also fails to meet the requirements for the age-based discrete-acts claim in Count 2.

## B.    Age-Based Hostile Work Environment

The parties' arguments as to the age-based hostile work environment claim mirror their arguments for the sex-based claim. The court's conclusion as to the objective "severe or pervasive" component of the age-based claim is the same as its conclusion for the sex-based claim. *See supra.* And the basis for dismissing the ADEA claim for lack of plausible allegations on causation is even stronger than the basis for dismissing the Title VII claim. *See Lively*, 6 F.4th at 303 ("[T]o establish age discrimination under the ADEA, a plaintiff must prove that age was the but-for cause of the employer's adverse decision." (internal quotation marks omitted)); *Bauers-Toy*, 2015 WL 13574291, at *4 ("While Title VII requires a plaintiff to

28

demonstrate that the discriminatory factor (such as sex, race, religion, etc.) was a substantial or motivating factor for defendant's actions, a plaintiff in an ADEA case must show that the discriminatory factor (age) was the only reason for the conduct.").

## IV.   Title VII and ADEA Retaliation Claims (Counts 5, 6)

In Counts 5 and 6, Mr. Rakiecki asserts retaliation under Title VII and under the ADEA. Unlike the statutory provisions for private employees, the applicable provisions for federal sector employees do not expressly prohibit retaliation. *See* 29 U.S.C. § 633a(a); 42 U.S.C. § 2000e-16(a). Nevertheless, as Defendant concedes (Doc. 5-4 at 19 n.4), the applicable provisions have the effect of prohibiting retaliation. *See Gomez-Perez v. Potter*, 553 U.S. 474, 491 (2008) ("[W]e hold that § 633a(a) prohibits retaliation against a federal employee who complains of age discrimination."); *Burford v. Yellen*, 246 F. Supp. 3d 161, 167 (D.D.C. 2017) (reasoning that § 633a(a) and § 2000e-16(a) both protect employees from retaliation). The court therefore applies the pleading standards for retaliation against private employees; Mr. Rakiecki "must plausibly allege that (1) defendants discriminated—or took an adverse employment action—against him, (2) 'because' he has opposed any unlawful employment practice." *Vega*, 801 F.3d at 90 (Title VII); *see also Schnabel v. Abramson*, 232 F.3d 83, 87 (2d Cir. 2000) (same standards for ADEA claims); *Witkowich v. Holder*, No. 05 Civ. 7756, 2010 WL 1328364, at *2 (S.D.N.Y. Mar 31, 2010) (same).

Defendant seeks dismissal of the federal retaliation claims for failure to plead facts establishing the latter causation element. In this context, causation means but-for causation, requiring "that the adverse action would not have occurred in the absence of the retaliatory motive." *Lively*, 6 F.4th at 307 (quoting *Duplan v. City of New York*, 888 F.3d 612, 625 (2d Cir.

29

2018)). "Causation may be shown by direct evidence of retaliatory animus or inferred through temporal proximity to the protected activity." *Id.* (quoting *Duplan*, 888 F.3d at 625).

Defendant argues that Mr. Rakiecki has not alleged direct evidence of retaliation and that he cannot show an inference of retaliation based on "temporal proximity" between his protected activity on four specific dates between 2018 and 2020 and the various allegedly retaliatory acts. (Doc. 5-4 at 20.) Mr. Rakiecki does not dispute Defendant's summary of the evidence; the shortest gap between any of the four incidents of protected activity and any of the alleged adverse acts was five months: the time between Mr. Rakiecki's April 2019 formal administrative complaint and September 2019 when a less senior colleague secured the collateral timekeeping duties that Mr. Rakiecki wanted. *(See id.* at 20–21.) But Mr. Rakiecki insists that he "engaged in protected activity on multiple occasions between 2018 and 2020 and there is a close temporal proximity in light of the fact that he alleges he was subjected to numerous examples of retaliatory conduct throughout the period from 2019 through 2020." (Doc. 8 at 10.) Defendant maintains that the Amended Complaint fails to state a retaliation claim under Title VII or the ADEA. (Doc. 9 at 7; *see also* Doc. 18-6 at 25.)

For purposes of Mr. Rakiecki's retaliation claims, "temporal proximity must be very close." *Abrams v. Dep't of Pub. Safety*, 764 F.3d 244, 254 (2d Cir. 2014) (quoting *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (per curiam)). But "there is no 'bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action.'" *Id.* (quoting *Gorman-Bakos v. Cornell Coop. Extension of Schenectady Cnty.*, 252 F.3d 545, 554 (2d Cir. 2001)). "[D]istrict courts in the Second Circuit have consistently allowed retaliation claims with gaps of two months between the alleged protected

activity and adverse employment action to survive defendants' motions to dismiss." *Medina v. AAM 15 Mgmt. LLC*, 750 F. Supp. 3d 332, 354 (S.D.N.Y. 2024). "Three months is on the outer edge of what courts in this circuit recognize as sufficiently proximate to admit an inference of causation." *Yarde v. Good Samaritan Hosp.*, 360 F. Supp. 2d 552, 562 (S.D.N.Y. 2005). This court suggested that it was "questionable" whether a four- to five-month gap is sufficiently "proximate." *Hardy v. Rochester Genesee Reg'l Transp. Auth.*, 906 F. Supp. 2d 178, 186 (W.D.N.Y. 2012).

Mr. Rakiecki relies on two Second Circuit decisions to suggest that the five-month (and longer) gaps in this case are sufficiently proximate. He relies on the Second Circuit's statement in *Gorzynski v. JetBlue Airways Corp.* that "we have previously held that five months is not too long to find the causal relationship." 596 F.3d 93, 110 (2d Cir. 2010) (citing *Gorman-Bakos*, 252 F.3d at 555). He also cites *Grant v. Bethlehem Steel Corp.*, 622 F.2d 43 (2d Cir. 1980), for the proposition that an eight-month gap was sufficiently proximate.

*Grant* is distinguishable. The defendant-union in that case was unable to retaliate for an eight-month period after the plaintiff filed EEOC charges because the plaintiff was on a job during that time. *Grant*, 622 F.2d at 45; *see also, e.g.*, *Siuzdak v. Sessions*, 295 F. Supp. 3d 77, 103 (D. Conn. 2018) (distinguishing *Grant* because the employer "retaliated at the first possible moment, *i.e.*, . . . the union could only act once the plaintiff returned from a previously arranged work assignment"); *Adams v. Ellis*, No. 09 Civ. 1329, 2012 WL 693568, at *16 n.6 (S.D.N.Y. Mar. 2, 2012) (distinguishing *Grant* because "circumstances made retaliation against certain plaintiffs impossible for an extended period of time"). Nothing in the allegations in Mr. Rakiecki's case suggest any similar impediment to Defendant's retaliation.

31

The *Gorzynski* decision also does not support Mr. Rakiecki's position. The retaliation claim relating to race in *Gorzynski* involved a gap of only about one month. *Gorzynski*, 596 F.3d at 110. The retaliation claim relating to sex involved a gap of "at most two months." *Id.* at 111. The retaliation claim relating to age involved a gap of "less than four months." *Id.* The *Gorzynski* court did not need to (and did not) hold that a five-month gap might have been sufficient as to any of the retaliation claims in that case.

Insofar as *Gorzynski* cited *Gorman-Bakos* as an example of a five-month gap being sufficient, the latter is also distinguishable. The five-month gap could be swept in together with multiple other shorter gaps. *See Gorman-Bakos*, 252 F.3d at 555 ("We are particularly confident that five months is not too long to support such an allegation *where plaintiffs have provided evidence of exercises of free speech and subsequent retaliatory actions occurring between December 1997 and April 1998*." (emphasis added)); *see also, e.g., Preuss v. Kolmar Lab'ys, Inc.*, 970 F. Supp. 2d 171, 198 n.29 (S.D.N.Y. 2013) (distinguishing *Gorman-Bakos* because the protected activity in that case "spanned nine months and continued until just days before adverse action occurred"). Although Mr. Rakiecki also engaged in protected activity multiple times between 2018 and 2020, none of the alleged retaliatory actions occurred sufficiently close in time to any of the protected activity. The court therefore concludes that the allegations do not plausibly support an inference of causation, and Defendant is entitled to dismissal of the retaliation claims in Counts 5 and 6.

## V.    Additional Title VII and ADEA Claims Related to Lt. Crawford (Counts 1, 2, 5, 6)

The Amended Complaint adds Title VII and ADEA discrimination and retaliation claims based on Lieutenant Jason Crawford's alleged conduct from June 2021 through 2022, Mr. Rakiecki's reports or grievances related to that alleged conduct, and alleged retaliation in

32

response to those reports and grievances. (*See* Doc. 17 ¶¶ 87–113.) The Amended Complaint states that Mr. Rakiecki raised these allegations in a complaint to the Office of Special Counsel ("OSC") on July 18, 2023, and then appealed an unfavorable OSC determination by filing an Individual Right of Action ("IRA") appeal with the Merit Systems Protection Board ("MSPB"). (*Id.* ¶ 5.) Defendant challenges the allegations related to Lt. Crawford on jurisdictional grounds, arguing that Mr. Rakiecki's appeal to the MSPB was IRA appeal such that "only the federal courts of appeals would have jurisdiction to hear Rakiecki's new allegations concerning Crawford." (Doc. 18-6 at 18.) And Defendant asserts that even if the appeal to the MSPB was a "mixed case" involving both a Whistleblower Protection Act ("WPA") claim and a discrimination claim, the new allegations are time-barred. (*Id.* at 19.)

## A.    The MSPB Appeal; Jurisdiction

Earlier in this case, Mr. Rakiecki moved to amend his complaint to add a WPA claim and to add Title VII and ADEA discrimination and retaliation claims stemming from Lt. Crawford's alleged conduct. (Doc. 11.) Defendant opposed both aspects of the proposed amendment. As to the proposed WPA claim, Defendant argued that the court lacked jurisdiction. (Doc. 12 at 13.) As to the proposed Title VII and ADEA claims, Defendant argued that Mr. Rakiecki had failed to exhaust his administrative remedies. (*Id.* at 15–16.)

The court agreed with Defendant that the proposed WPA claim was futile for lack of jurisdiction. (Doc. 16 at 9–10.) However, Defendant's opposition to the proposed Title VII and ADEA claims was framed as a failure-to-exhaust argument. The court analyzed that argument under Fed. R. Civ. P. 12(b)(6) (*see* Doc. 16 at 5–8 & n.3) and did not consider extra-pleading materials, including the materials Defendant appended to the opposition (Doc. 12-1). The court concluded that Defendant had not met the burden to show non-exhaustion. (Doc. 16 at 8.) The

33

court reasoned that Defendant had not shown that Mr. Rakiecki's pursuit of relief via the OSC and the MSPB was not a "mixed case" asserting (and exhausting) both a WPA claim and a discrimination claim. Although both the proposed amended complaint and the MSPB itself characterized the MSPB appeal as an "IRA appeal"—described in *Young v. MSPB*, 961 F.3d 1323, 1328 (Fed. Cir. 2020), as being by definition "never 'mixed cases'"—the court inferred from the proposed amended complaint that Mr. Rakiecki's appeal to the MSPB *was* a "mixed case" because the pleading expressly described the appeal as involving "instances of discrimination and harassment." (Doc. 16 at 7–8.)

Now, Defendant altered the prior exhaustion argument to include an argument that the court lacks *jurisdiction* over the Title VII and ADEA discrimination and retaliation claims based on Lt. Crawford's alleged conduct. (Doc. 18-6 at 14.) The court evaluates that jurisdictional argument under Fed. R. Civ. P. 12(b)(1). As noted above, the court can consider extra-pleading materials under this rule. *Morrison*, 547 F.3d at 170. There is no need to apply the summary judgment procedure under Fed. R. Civ. P. 56 in order to consider the extra-pleading materials relevant to Defendant's jurisdictional argument.

As with the prior exhaustion analysis, the jurisdictional analysis depends on how to characterize Mr. Rakiecki's OSC complaint and subsequent MSPB appeal. The form on which Mr. Rakiecki presented his OSC complaint provided instructions and advice for "complaints involving discrimination." (Doc. 18-4 at 7.) But the "prohibited personnel practices" alleged in the OSC complaint are all described as "Retaliation for Protected Activity" as prohibited by 5 U.S.C. § 2302(b)(9). (*Id.* at 9, 14–15.) There is no mention in the OSC complaint of alleged discrimination based on sex or age as prohibited by 5 U.S.C. § 2302(b)(1). Similarly, OSC

34

investigated and evaluated the complaint under § 2302(b)(8) and (9)—but not under § 2302(b)(1). (Doc. 18-4 at 22, 24.)

On appeal of the OSC's unfavorable determination to the MSPB, Mr. Rakiecki asserted that the OSC had erred; he reiterated his position that the VA "retaliated" against him. (Doc. 18-4 at 36.) He did not mention discrimination. He completed "Question 18," which the MSPB appeal form stated should be completed "ONLY if you are filing an IRA appeal." (*Id.* at 37.) The MSPB Administrative Judge assigned to the appeal also described the appeal as an "individual right of action (IRA) appeal." *Rakiecki v. Dep't of Veterans Affs.*, No. PH-1221-25-0247-W-1, 2025 WL 1828138 (M.S.P.B. June 23, 2025). The Administrative Judge dismissed the appeal for lack of jurisdiction.

Based on this evidence, the court can only conclude that Mr. Rakiecki's appeal to the MSPB was an IRA appeal as that term is defined in *Young*: an appeal "limited to the merits of allegations of violations of the Whistleblower Protection Act" and under which "[d]iscrimination claims may not be raised." 961 F.3d at 1327. Thus, to the extent that Mr. Rakiecki in this federal case is attempting to appeal the MSPB's unfavorable decision, the federal district court lacks jurisdiction to hear that appeal. *Compare* 5 U.S.C. § 7703(b)(1)(A) (generally, "a petition to review a final order or final decision of the Board shall be filed in the United States Court of Appeals for the Federal Circuit") *with* 5 U.S.C. § 7703(b)(2) (exception for cases of discrimination, which are to be filed in a district court under the Civil Rights Act, the ADEA, or the Fair Labor Standards Act). The court therefore agrees with Defendant that jurisdiction is lacking in this respect.

## B.     Exhaustion (Reprise)

The absence of jurisdiction in this court to hear an appeal of the MSPB's unfavorable determination does not end the analysis.  Mr. Rakiecki did not raise his discrimination claims in his MSPB appeal, but that "does not necessarily preclude [him] from raising them here." *Kleiman v. Chertoff*, No. 03-cv-3829, 2007 WL 9706519, at *5 (E.D.N.Y. July 10, 2007). Instead, "[f]ederal employees with Title VII claims that are not mixed with adverse actions within the MSPB's jurisdiction must file an initial complaint with their agency EEO to pursue their claims." *Id.* (first alteration in original; quoting *Chappell v. Chao*, 388 F.3d 1373, 1375 n.2 (11th Cir. 2004)).  The court therefore returns to the question of exhaustion that the court considered in the March 2026 Order.

As the court previously noted: "Under Title VII and the ADEA, the affirmative defense of failure to exhaust administrative remedies is analyzed under Rule 12(b)(6)." (Doc. 16 at 5.) And it is true that, as a general rule, extra-pleading material cannot be considered under Rule 12(b)(6). *See, e.g.*, Fed. R. Civ. P. 12(d) (procedure for conversion to summary judgment when, on a Rule 12(b)(6) motion, "matters outside the pleadings are presented to and not excluded by the court"); *Clark v. Hanley*, 89 F.4th 78, 93 (2d Cir. 2023) (court's task under Rule 12(b)(6) is "to assess the pleadings"); *Tewksbury v. Ottaway Newspapers*, 192 F.3d 322, 324 n.1 (2d Cir. 1999) ("Rule 12(b)(6) does not give the district court authority to consider matters outside the pleadings . . . ." (quoting *LaBounty v. Adler*, 933 F.2d 121, 123 (2d Cir. 1991))).

However, in some cases, it may be proper to consider certain extra-pleading materials in the context of a Rule 12(b)(6) exhaustion argument. *See Frazier v. Stanley*, No. 16 Civ. 804, 2018 WL 11585450, at *12 n.7 (S.D.N.Y. Nov. 29, 2018) ("[W]hen a defendant raises an

36

exhaustion argument, the Court may also consider EEOC papers the parties provide to the court."). In other cases, the court might deem the exhaustion argument to be made under the summary judgment procedure in Rule 56. *Tewksbury*, 192 F.3d at 324 n.1. In this case, the court concludes that the result under either approach is the same.[11]

Here, Mr. Rakiecki asserts in his Amended Complaint that he "exhausted all administrative remedies." (Doc. 17 ¶ 5.) The court does not accept that conclusory assertion as true. As discussed above, Mr. Rakiecki's MSPB appeal was an IRA appeal within the meaning of *Young*; it did not include a discrimination complaint and does not serve to exhaust that claim. And the administrative actions recounted in the Amended Complaint do not identify any discrimination complaint about Lt. Crawford's conduct filed with the EEOC under 29 C.F.R. § 1614.101 et seq. It therefore remains to consider whether to excuse the failure to exhaust under the "reasonably related claims" exception.

As the Second Circuit has stated: "[I]n certain circumstances it may be unfair, inefficient, or contrary to the purposes of the statute to require a party to separately re-exhaust new violations that are 'reasonably related' to the initial claim." *Duplan v. City of New York*, 888 F.3d 612, 622 (2d Cir. 2018). Mr. Rakiecki appears to invoke this exception, arguing that the allegations regarding Lt. Crawford in the Amended Complaint "arose during and after the commencement of this action and are directly tied to the discrimination and retaliation alleged by the plaintiff." (Doc. 19 at 17.) Defendant disagrees, arguing that the allegations concerning

---

[11] To the extent that the summary judgment procedure is preferable, the court notes that Mr. Rakiecki has had the opportunity to respond to Defendant's assertions regarding the relevant undisputed facts. Although Mr. Rakiecki argues that summary judgment would be premature because he has not had an opportunity to conduct discovery (Doc. 19 at 26–27), the relevant facts consist entirely of agency records and actions that are beyond dispute and that Mr. Rakiecki does not dispute (*see* Doc. 19-1). Mr. Rakiecki does not identify what other facts he seeks to uncover in discovery that might be relevant to the exhaustion issue presented here.

Lt. Crawford "relate to a different time period, the involvement of different individuals, and retaliation by a different supervisor." (Doc. 20 at 5–6.)

The court agrees with Defendant on this point. The allegations regarding Lt. Crawford involve different people and a different time period. Mr. Rakiecki suggests that Lt. Crawford's conduct represents an "ongoing pattern of retaliation and discrimination" similar to the alleged misconduct involving Ms. Stanbro and Chief Steinmetz from 2017 through 2020. (Doc. 19 at 17.) The court is not persuaded that Mr. Rakiecki's view of Lt. Crawford's conduct as fitting a "pattern" is sufficient to make that conduct "reasonably related" to the prior alleged conduct of other individuals at other times. The court therefore concludes that Defendant is entitled to dismissal of the additional Title VII and ADEA claims related to Lt. Crawford for failure to exhaust administrative remedies.

## Conclusion

Defendant's Motion to Dismiss (Doc. 5) is DENIED as moot as to Counts 3, 4, and 7 because Plaintiff has stipulated to dismissal of those counts. That motion (Doc. 5), as supplemented by Defendant's further motion to dismiss of April 2026 (Doc. 18) is GRANTED as to the remaining counts.

Dated this 6th day of July, 2026.

Geoffrey W. Crawford, Judge
United States District Court

38